# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Ronald Kinslow and Lucas Hill,

                Plaintiffs,

                         Case No. 1:19-cv-1605-MLB

v.

5 Star Field Services Group, LLC,
Title One Management, LLC, and
Robert Gilstrap,

                Defendants.

_____/

## OPINION & ORDER

Plaintiffs Ronald Kinslow, Lucas Hill, and Elias Medina[1] sued Defendants 5 Star Field Services Group, LLC ("Five Star"); Title One Management, LLC ("Title One"); and Robert Gilstrap for unpaid overtime wages in violation of the Fair Labor Standards Act ("FLSA") and breach of contract in violation of Georgia law.  (Dkt. 1 ¶ 1.)  Defendants move for summary judgment.  (Dkt. 63.)  The Court denies that motion.

---

[1] Medina is an opt-in plaintiff.  (*See* Dkts. 22; 22-1.)

## I.    Background

### A.    The Court's Use of Proposed Facts and Responses

The Court draws the facts largely from the parties' submissions.  In support of their motion for summary judgment, Defendants filed a statement of material facts (Dkt. 63-5).  *See* LR 56.1(B)(1), NDGa. Plaintiffs responded to Defendants' statement of material facts (Dkt. 70). *See* LR 56.1(B)(2)(a).  Plaintiffs also filed a separate statement of facts that they contend are material and present genuine issues for trial (Dkt. 71).[2]  *See* LR 56.1(B)(2)(b).

The Court uses the parties' proposed facts and responses as follows. When a party does not dispute the other's fact, the Court accepts it for

---

[2] The Local Rules require that when a respondent files such a statement of facts, the movant "shall file a response to each of the respondent's facts." LR 56.1(B)(3).  Defendants did not do so here.  Defendants filed a reply brief in support of their motion for summary judgment but did not file a response to each of Plaintiffs' additional facts. (Dkt. 76.)  However, unlike Local Rule 56.1(B)(2)(a)(2), which allows the Court to deem each of the movant's facts admitted if the respondent fails to respond to them in appropriate ways, the Court cannot simply deem the respondent's (i.e., Plaintiffs') additional facts admitted because Defendants did not respond to them.  *See generally* LR 56.1(B)(3) (requiring movant to respond to additional facts but not providing for such facts to be deemed admitted in the absence of a sufficient response).  But when Plaintiffs' proposed additional facts are material and supported by the record cites provided, the Court will include them in its factual recitation.

purposes of summary judgment and cites the proposed fact and corresponding response. When one side admits a proposed fact in part, the Court includes the undisputed part. When one side denies the other's proposed fact in whole or in part, the Court reviews the record and determines whether a fact dispute exists. If the denial lacks merit, the Court deems the fact admitted so long as the record citation supports it. If a fact is immaterial, it is excluded.[3] If a fact is stated as an issue or legal conclusion, it is excluded. *See* LR 56.1(B)(1)(c). Where appropriate, the Court modifies one party's fact per the other's response when the latter better reflects the record. Finally, as needed, the Court draws some facts directly from the record. *See* Fed. R. Civ. P. 56(c)(3) ("The court

---

[3] Some proposed facts the Court declines to exclude on materiality grounds are not "material" as that term is generally employed in the summary judgment context. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (identifying material facts as those that "might affect the outcome of the suit under the governing law"). Some are included for background purposes or to generate context for the Court's analysis. Which facts ultimately prove material should be apparent from the analysis.

need consider only the cited materials, but it may consider other materials in the record.").

As a preliminary matter, the Court resolves two issues. First, Plaintiffs repeatedly object to several factual assertions in Defendants' statement as "compound," but they do not support their objections with authority or developed argument. (*See, e.g.*, Dkt. 70 ¶¶ 8, 14–15, 19, 22, 26–27, 29, 37, 62.) Those objections are forfeited. *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived."). The objections also fail on the merits, as "compound" is an objection to form and thus provides no basis for disregarding a factual assertion on summary judgment. *See Federated Bank v. Fed. Deposit Ins. Corp.*, No. 1:12-cv-3445-SCJ, 2014 WL 12634299, at *8 (N.D. Ga. Aug. 12, 2014) ("[T]he Eleventh Circuit has held that summary judgment evidence need not be presented in admissible form as long as it can be 'reduced to admissible evidence at trial.'" (quoting *McMillian v. Johnson*, 88 F.3d 1573, 1583–85 (11th Cir. 1996))); *Burgess v. Allstate Ins. Co.*, 334 F. Supp. 2d 1351, 1354 (N.D. Ga. 2003) ("Evidence produced for summary judgment need not be in an

admissible form if it could be reducible to admissible form for trial."
(citing *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1444
(11th Cir. 1991) (en banc))).  The Court overrules Plaintiffs' objections to
the compound nature of the proposed facts.  The Court recognizes that
Plaintiffs said, should the Court overrule their objection, they would
respond to each individual fact.  That is not how this works.  Plaintiffs
get one chance to respond.  *See* LR 56.1(B)(2)(a) ("A respondent to a
summary judgment motion shall include the following documents with
the responsive brief: A response to the movant's statement of undisputed
facts.").  Were the Court to permit every litigant multiple opportunities
to respond to proposed facts, the Court would litigate and re-litigate the
facts and never reach the merits of the motion for summary judgment.
The Court thus declines to afford Plaintiffs a second bite at the apple and
turn this case into one that might never end.

Second, in opposing summary judgment, Plaintiffs rely heavily on
a deposition given by Title One's 30(b)(6) representative, Christian
Lamoreaux, in a workers' compensation lawsuit brought by Kinslow
against Cleveland Electric.  Defendants in their reply brief ask the Court
to strike the deposition, arguing it violates Federal Rule of Civil

Procedure 32(a)(8).[4]   (Dkt. 76 at 3–6.)   Plaintiffs object to Defendants

raising this issue for the first time in their reply and argue Defendants'

argument should not be considered by the Court.  (Dkt. 77 at 2–3.)  While

it is generally true that arguments raised for the first time in a reply are

not properly before a court, *Herring v. Secretary, Department of

Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005), that rule does not

apply when the reply is merely responding to an argument set forth in

the response, *see, e.g.*, *First Specialty Insurance Group v. 633 Partners,

Ltd.*, 300 F. App'x 777, 788 (11th Cir. 2008) (per curiam) (trial court

properly considered reply evidence submitted to respond to arguments

raised in opposition to motion to dismiss).   Here, Plaintiffs filed the

deposition on the same day they responded.  (*See* Dkts. 69; 72; *see also*

Dkt. 73.)  Accordingly, Plaintiffs' use of the deposition did not become

---

[4] Rule 32(a)(8) allows a litigant to use as evidence a deposition taken in
an earlier action as follows:

> A deposition lawfully taken and, if required, filed in any
> federal- or state-court action may be used in a later action
> involving the same subject matter between the same parties,
> or their representatives or successors in interest, to the same
> extent as if taken in the later action.  A deposition previously
> taken may also be used as allowed by the Federal Rules of
> Evidence.

Fed. R. Civ. P. 32(a)(8).

evident until after Defendants had already filed their motion for summary judgment.  Defendants raised their objection at the first available opportunity—i.e., in their reply.  Plaintiffs argue "Defendants were in possession of the 2018 Title One Deposition transcript and should have anticipated it[s] entry into the record and use, and therefore should have raised the issue in the initial motion."  (Dkt. 77 at 2.)  While this may mean Defendants were aware of the deposition and its contents before filing their motion for summary judgment, it does not mean Defendants knew Plaintiffs would use it or needed to anticipate Plaintiffs would use it and lay out an argument against its admission before the issue even arose.[5]  Overall, the Court does not think Defendants waived their objection.

Alternatively, Plaintiffs argue the deposition is admissible.  (*Id.* at 3–6.)  The decision whether to admit a deposition from a prior lawsuit is committed to the sound discretion of the district court.  *RehabCare Grp.*

---

[5] The Court also takes issue with Plaintiffs' argument on this point because they did not do what they are asking the Court to expect of Defendants—i.e., Plaintiffs did not anticipate Defendants' objection to the admission of the deposition and proactively lay out an argument in their response before the issue even arose.  Instead, they filed what is essentially a surreply.  (*See* Dkt. 77.)

*E., Inc. v. HealthPrime, Inc.*, No. 1:05-cv-2540-TCB, 2008 WL 11404502, at *3 (N.D. Ga. Jan. 16, 2008). "Rule 32(a)(8) provides that a party may use a deposition that was 'lawfully taken' and filed in a previous action in a later civil action, to the same extent as if taken in the later action, where the two proceedings involve 'the same subject matter between the same parties,' or where allowed by the Federal Rules of Evidence." *Walker v. Blitz USA, Inc.*, No. 1:08-CV-121-ODE, 2009 WL 10669635, at *3 (N.D. Ga. Feb. 24, 2009) (quoting Fed. R. Civ. P. 32(a)(8)). While the parties dispute whether the earlier action involves the "same subject matter" and "same parties," the latter provision of Rule 32(a)(8), which specifically incorporates the Federal Rules of Evidence into its provisions, authorizes Plaintiffs' use of the deposition. Federal Rule of Evidence 801(d)(2) allows Plaintiffs to use the deposition as an admission of a party-opponent.[6] The Court thus overrules Defendants' objection to the admission of the 2018 Title One deposition.

---

[6] *See, e.g.*, *Vedros v. Grumman*, No. 11-1198, 2015 WL 3796379, at *4 (E.D. La. June 18, 2015) ("While Rule 32(a)(8) does impose a requirement that the deposition involve the same subject matter and same parties as the current trial, it also allows for the use of deposition testimony at trial when such is 'allowed by the Federal Rules of Evidence.' Accordingly, because the Court has determined that Vedros's deposition is admissible

The Court resolves some issues and other objections in the facts section below.

## B.   Facts[7]

Gilstrap is the sole owner of both Title One and Five Star.  (Dkts. 61 at 27:5–11; 62 at 9:12–22; 71 ¶ 3.)[8]  Title One is a residential property management company.  (Dkts. 63-5 ¶ 1; 70 ¶ 1.)   Five Star does maintenance and rehab of residential rental properties for Title One, other property management companies, and individual landlords.  (Dkts. 63-5 ¶¶ 7, 11; 70 ¶¶ 7, 11.)  When a Title One client needs maintenance

---

pursuant to the Federal Rules of Evidence, it is not necessary that the deposition involve all defendants made party to the lawsuit." (internal citation omitted)); *Pinkney v. Winn-Dixie Stores, Inc.*, No. CV214-075, 2014 WL 7272551, at *2 (S.D. Ga. Dec. 17, 2014) ("While the parties dispute the 'same subject matter' and 'same parties' language, the latter provision of Rule 32(a)(8) plainly authorizes Plaintiff's use of the Gabler deposition.   Rule 32(a)(8) permits using a deposition from an earlier action as allowed by the Federal Rules of Evidence, and, as discussed *supra,* evidentiary rule 801(d)(2) allows Plaintiff to use the Gabler deposition as an admission of a party-opponent.  It follows, then, that Rule 32(a)(8) permits Plaintiff to use the Gabler deposition as an admission of a party-opponent.").

[7] Unless otherwise specified, the Court cites the CM/ECF page numbers.
[8] For the 2020 Title One deposition filed as Document 62, the Court cites the deposition page numbers, not the page numbers applied by the CM/ECF system, due to the formatting of the document.

work done, Title One contacts a maintenance company, such as Five Star, to perform the work.  (Dkts. 61 at 77:3–19; 63-5 ¶ 14; 70 ¶ 14.)

Five Star is "part of the Title One family of companies."  (Dkts. 71 ¶ 1; 73 at 11:23–12:1.)  Five Star does not make any money but it stays in business because providing maintenance repairs is deemed an essential function of managing residential property (i.e., Title One's business).  (Dkts. 60 at 31:12–32:4; 71 ¶ 12.)  Christian Lamoureux manages the Title One office operations on a day-to-day basis and performs managerial duties at Five Star.  (Dkts. 62 at 18:15–19; 63-5 ¶ 3; 70 ¶ 3; 71 ¶ 49.)  Everyone who works for Five Star or Title One is assigned a Title One email address.  (Dkts. 61 at 51:16–52:2; 71 ¶ 57.)  Title One and Five Star share the same office with adjoining suites.  (Dkts. 61 at 149:24–151:2; 71 ¶ 61.)  The website for Title One lists individuals who work at both Title One and Five Star.  (Dkts. 69-1 at 278–96; 71 ¶ 56.)  Title One and Five Star, however, do not share any joint bank accounts or credit card accounts.  (Dkts. 61 at 78:5–23; 63-5 ¶ 15; 70 ¶ 15.)

Plaintiffs provided handyman work.  (Dkts. 63-5 ¶ 9; 70 ¶ 9.)  Their work did not require a license or specialty training.  (Dkts. 64 at 21:6–9,

23:11–15; 65 at 15:6–9, 23:2–7; 66 at 26:13–27:5; 71 ¶ 48.)  Defendants use an "inside technicians model."  (Dkts. 71 ¶ 7; 73 at 24:8–9.) Lamoreaux said Defendants "try to keep the work in-house as much as possible" but it is not always economically feasible for "my guys" to do the work.  (Dkts. 71 ¶ 9; 73 at 27:14–18.)  Defendants expected Plaintiffs to work exclusively for them Monday through Friday, 8:00 a.m. to 6:00 p.m. (Dkts. 66 at 56:6–12, 101:11–13; 71 ¶ 14; 73 at 17:15–18:6, 19:1–11.) Plaintiffs were required to attend a weekly mandatory maintenance meeting.  (Dkts. 64 at 91:18–23, 121:8–15; 66 at 57:14–17, 58:6–7; 69-1 at 418; 71 ¶ 26; 73 at 49:5–20.)  Plaintiffs could not, and did not, hire any subcontractors to assist with work orders assigned by Defendants.  (Dkts. 64 at 87:1–8; 65 at 50:9–11; 66 at 82:14–18; 71 ¶ 35.)  Plaintiffs could not offer additional services to Defendants' customers without permission from Defendants.  (Dkts. 65-1 at 7; 66-1 at 6; 71 ¶ 31.)  Gilstrap had the authority to terminate Plaintiffs and set policies applicable to them. (Dkts. 60 at 16:25–17:25; 69-1 at 369–70, 427; 71 ¶¶ 64, 67.)  He often directed Plaintiffs to work on his home or rental homes.  (Dkts. 66 at 58:18–19, 101:6–10; 69-1 at 468; 71 ¶ 68; 73 at 25:12–21.)

Plaintiffs used apps to manage their work orders, track their time, and submit their locations.[9] (Dkts. 64 at 65:19–66:19, 91:3–7; 65-1 at 12–13; 66 at 78:4–14; 66-1 at 13–14; 69-1 at 427; 71 ¶ 38.)   Defendants originally told Plaintiffs to use the app on their own mobile devices but later issued tablets. (Dkts. 64 at 47:9–10, 66:16–19; 66 at 75:14–18; 69-2 ¶¶ 1–2; 69-4 ¶ 1; 71 ¶ 40.)   If Plaintiffs drove a personal vehicle while working, Defendants tracked them using a GPS function in an app. (Dkt. 66 at 77:13–15.)  But if Plaintiffs drove a company vehicle while working, Defendants tracked them using the GPS location features in the vehicle and a GPS function in an app. (*Id.* at 77:15–18.)  Hill testified that, if you did not have your GPS location on, Defendants would not pay you. (*Id.* at 78:12–14.)

Defendants required Plaintiffs to take pictures of their work as part of fulfilling their job duties and to get paid. (Dkts. 64 at 116:8–20; 65 at 65:16–66:4, 66:24–67:9; 66 at 58:15, 78:9–14; 71 ¶ 37.)   If a repair

---

[9] There is a genuine dispute of material fact as to whether Defendants required the use of the app or not. Defendants provided evidence showing Defendants did not require the app and Plaintiffs were the ones who requested the app be implemented (Dkt. 63-5 ¶ 12), and Plaintiffs provided evidence showing Defendants required that the app be used (Dkts. 70 ¶ 12; 71 ¶¶ 38, 40).

exceeded $200, Plaintiffs were required to get permission from Title One. (Dkts. 61 at 131:6–132:13; 69-1 at 327, 329, 454, 456, 458; 71 ¶ 29.) Defendants would replace tools that broke or replenish materials needed for repairs.  (Dkts. 64 at 107:6–8; 71 ¶ 34; 73 at 17:25–18:2.)

### 1.  Kinslow

Kinslow has been a handyman for 37 years.  (Dkts. 63-5 ¶ 18; 70 ¶ 18.)  He admits that he was an independent contractor except for April 9, 2018 through January 2019.[10]  (Dkts. 63-5 ¶ 23; 70 ¶ 23.)  Accordingly, this period is the only time frame for which he is claiming damages. (Dkts. 63-5 ¶ 23; 70 ¶ 23.)  He was paid by Five Star and regularly negotiated with Five Star for pay increases.[11]  (Dkts. 63-5 ¶¶ 32, 34; 70

---

[10] He testified that in January 2019 Gilstrap informed him that Five Star was changing its inside technicians to be independent contractors.  (Dkts. 64 at 119:20–120:10, 126:16–127:4; 71 ¶ 6.)

[11] There is genuine dispute of material fact as to whether Kinslow was paid solely by the hour or by the hour and on a flat fee basis.  Defendants provided evidence where Gilstrap (as Five Star's 30(b)(6) representative) testified that Kinslow sometimes worked by the hour and sometimes did flat-fee jobs.  (Dkt. 63-5 ¶ 10 (citing Dkt. 61 at 36:10–18).)  On the other hand, Plaintiffs provided evidence where Lamoureux (as Title One's 30(b)(6) representative) testified that technicians are paid by the hour and Kinslow made $26 per hour and Kinslow said he never worked on a flat fee basis.  (Dkt. 70 ¶ 10 (citing Dkt. 64 at 90:16–91:2; 73 at 41:4–14).) For purposes of summary judgment, "[i]t is not the court's role to weigh conflicting evidence."  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

¶¶ 32, 34.)  He says he could have stopped working for Five Star at any time during that period.  (Dkts. 63-5 ¶ 38; 70 ¶ 38.)  He never got any employee benefits or paid vacation time from Five Star or Title One.[12] (Dkt. 64 at 81:11–25.)  He sometimes complained to Five Star that he needed more hours of work per week.  (Dkts. 63-5 ¶ 39; 70 ¶ 39; 64 at 111:13–112:1, 122:3–17.)

Kinslow said neither Five Star nor Title One ever provided any training because it was "[a]ll common sense."  (Dkts. 63-5 ¶ 29; 70 ¶ 29; 64 at 81:2–5.)  Kinslow said he "was not allowed to decline work orders that Defendants sent" him and Lamoureux told him that, if he did not like the work assigned to him, he could see himself out the door because his "job was to perform the work Defendants assigned."  (Dkt. 69-3 ¶¶ 1– 2.)  He could, however, ask for a work order to be reassigned if it was not a job he was qualified to do, an option he never exercised.  (Dkts. 63-5 ¶ 25; 70 ¶ 25; 64 at 69:1–13.)  Kinslow said individuals from Five Star

---

[12] The Court acknowledges that Plaintiffs object to this fact as compound, poorly worded, and calls for speculation.  (Dkt. 70 ¶ 30.)  The Court overrules Plaintiffs' compound objection for the reasons previously stated and their speculation objection because the Court does not think the fact calls for speculation.  The Court, however, agrees that Defendants' factual assertion is poorly worded, so the Court pulls the information directly from the record.

and Title One would check in on him to see how long a certain repair would take, but they did not check in to see, for example, what he was fixing or what tool he was using. (Dkts. 63-5 ¶ 29; 70 ¶ 29; 64 at 79:25–80:22.)  He testified that whenever he needed assistance with anything, he would contact Gilstrap and Gilstrap would walk him through the problem on the phone. (Dkt. 64 at 88:3–17.)  Five Star told Kinslow that it would make tenants feel more comfortable and be more professional if he (and others) wore Five Star shirts while completing work orders. (Dkts. 63-5 ¶ 35; 70 ¶ 35; 64 at 101:18–103:1.)

As far as tools, Kinslow stated it would be unusual for a handyman not to have some of his own tools, such as a tool bag and tape measure. (Dkts. 63-5 ¶ 22; 70 ¶ 22; 64 at 36:15–37:2.)  He "had every tool you wanted." (Dkts. 63-5 ¶ 26; 70 ¶ 26; 64 at 72:4–6.)  He only had to borrow a tool from Five Star or Title One when it was "something big" that he did not have, such as a "big snake . . . to run through a drain." (Dkts. 63-5 ¶ 26; 70 ¶ 26; 64 at 72:9–21.)  Kinslow testified Defendants never gave him any tools. (Dkt. 64 at 72:16–73:2; *see also* Dkts. 63-5 ¶ 27; 70 ¶ 27.)  But in January 2019, a battery went missing and he asked Gilstrap to replace it because "they said if you use your tools and if you

break them or anything, that they would replace them." (Dkt. 64 at 106:13–107:22; *see also* Dkts. 63-5 ¶ 37; 70 ¶ 37.) Kinslow used vehicles owned by Defendants during work. (Dkts. 64 at 58:11–18, 73:14–17; 71 at 8 n.7.)

Kinslow testified that there were "[s]everal weeks" when he worked overtime and did not get paid for that overtime work. (Dkt. 64 at 91:8–15.) He testified that he worked an average of "60-plus hours a week" from April 2018 to January 2019. (*Id.* at 94:2–9.)

### 2.   Hill

Hill worked for Five Star from May 2017 until August 6, 2018. (Dkts. 63-5 ¶ 42; 70 ¶ 42.) He got hired by answering an ad that was seeking an "in-house maintenance technician." (Dkt. 66 at 31:9–16, 52:15–20, 108:10–12.) Hill testified that Gilstrap was involved in the decision to hire him. (*Id.* at 31:9–32:8.) During his time with Five Star, he sometimes took a break from working, was incarcerated for four weeks, and took a week of vacation in July 2017. (Dkt. 66 at 48:6–18, 101:15–102:1; *see also* Dkts. 63-5 ¶¶ 43–44, 51; 70 ¶¶ 43–44, 51.) He was

paid by the hour.[13]  (Dkts. 61 at 31:20–24; 66 at 71:2–6; 70 ¶ 10; 71 ¶ 27.)

He negotiated his hourly rate, which fluctuated from $23 to $26 per hour.

(Dkts. 63-5 ¶ 49; 70 ¶ 49.)  He testified that he was not allowed to bid on

jobs.  (Dkts. 66 at 56:4–5; 71 ¶ 28.)  During his time with Five Star, he

did not receive any insurance benefits, health insurance, pension, or a

401(k)-retirement plan.  (Dkts. 63-5 ¶ 50; 70 ¶ 50.)

When he came to work for Five Star, Hill had handyman tools, such

as a ladder, drills, hammer, and a saw.  (Dkts. 63-5 ¶ 48; 70 ¶ 48.)  Hill

testified that, if he did not have a tool that he needed for a job, Defendants

instructed him to go to Home Depot and buy the tool.  (Dkt. 66 at 80:8–

15.)  At the beginning, he drove a truck that was owned by an extended

family member, but in 2018 he used a van owned by Gilstrap.  (Dkts. 66

at 51:3–22, 90:9–14; 71 at 8 n.7.)

---

[13] The Court recognizes that one of Defendants' proposed facts says, "Plaintiffs were paid by Five Star by the hour and on a flat fee basis." (Dkt. 63-5 ¶ 10.)  As support for this proposed fact, they cite the Five Star deposition where Gilstrap (as Five Star's 30(b)(6) representative) testified that Kinslow sometimes worked by the hour and sometimes did flat-fee jobs.  (*Id.* (citing Dkt. 61 at 36:10–18).)  Because this testimony only applies to Kinslow, Defendants provided no evidence to suggest Hill was paid by the hour *and* on a flat fee basis.  Indeed, in that same deposition Gilstrap said Hill was paid "20-something dollars an hour." (Dkt. 61 at 31:20–24.)

Hill testified that he "[a]bsolutely" turned in a payroll sheet that had more than 40 hours of work on it during the time he worked for Five Star. (Dkt. 66 at 67:9–12.) He also testified that "almost every week was over 40" hours and 90% were over 50 hours per week. (*Id.* at 99:19–24, 100:24–101:2.) More broadly, he testified that "it was very rare" that "any of the technicians worked a week and we only had under 40 hours." (*Id.* at 101:4–6.)

### 3. Medina

Medina is seeking compensation from Defendants from January to October 2017. (Dkts. 63-5 ¶ 57; 70 ¶ 57; 65 at 26:9–18.) Gilstrap hired Medina. (Dkts. 65 at 30:5–18; 71 ¶ 65.) He was paid by the hour (Dkts. 65 at 30:19–24, 63:7–13; 70 ¶ 10; 71 ¶ 27),[14] specifically Five Star paid him $25.96 per hour (Dkts. 63-5 ¶¶ 60–61; 70 ¶¶ 60–61). Medina testified that he and Gilstrap agreed on his pay rate and one time he contacted

---

[14] Again, the Court recognizes that one of Defendants' proposed facts says, "Plaintiffs were paid by Five Star by the hour and on a flat fee basis." (Dkt. 63-5 ¶ 10.) As support for this proposed fact, they cite the Five Star deposition where Gilstrap (as Five Star's 30(b)(6) representative) testified that Kinslow sometimes worked by the hour and sometimes did flat-fee jobs. (*Id.* (citing Dkt. 61 at 36:10–18).) Because this testimony only applies to Kinslow, Defendants provided no evidence to suggest Medina was paid by the hour *and* on a flat fee basis.

Gilstrap when his compensation was wrong, and Gilstrap fixed it. (Dkt. 65 at 48:22–49:8.)  He testified that he and Hill were called "in-house handymen," "Mark's technicians," or "Robert's technicians," the last of which is a reference to Robert Gilstrap. (Dkts. 65 at 58:25–59:14; 71 ¶ 25.)  In 2017, Lamoureux wrote an email to Medina notifying him that a work order had been reassigned to "an outside vendor." (Dkt. 69-1 at 473.)  During his time with Five Star, he did not receive any benefits or paid vacation time. (Dkts. 63-5 ¶ 64; 70 ¶ 64.)  If he needed to be absent for some reason, he had to ask for permission otherwise it would result in termination. (Dkts. 65 at 42:25–43:9; 71 ¶ 20.)

Medina sometimes complained to Five Star that he was not getting enough work. (Dkts. 63-5 ¶ 67; 70 ¶ 66.)[15]  Five Star never provided any training for the work he was doing, and neither Title One nor Gilstrap ever told him how to do the job. (Dkts. 63-5 ¶¶ 68–70; 70 ¶¶ 67–69.)  Five Star sometimes sent people, such as Sergio or Jason, to the jobsite to supervise Medina. (Dkts. 63-5 ¶ 72; 70 ¶ 71; 65 at 50:12–21.)  He could

---

[15] On page 22 of Plaintiffs' response to Defendants' statement of facts, Plaintiffs forgot to number one of the paragraphs. (Dkt. 70 at 22.) Accordingly, from that page onward, their paragraph numbers do not align with Defendants' paragraph numbers. The Court will cite Plaintiffs' paragraph numbers.

say no or refuse a work order, but he feared repercussions.  (Dkts. 63-5 ¶ 65; 70 ¶ 65; 65 at 43:10–12; 69-4 ¶ 4.)  He exercised this option once by asking for a cleaning job to be reassigned to a cleaning crew.  (Dkts. 63-5 ¶ 65; 70 ¶ 65; 65 at 46:14–20; 69-4 ¶ 5.)  While Medina often scheduled his own work, Title One and Five Star sometimes scheduled the work for him as well.  (Dkts. 63-5 ¶ 66; 70 at unnumbered para. on p. 22; 65 at 44:12–45:8, 67:12–20; 69-1 at 452–55.)  He did not have an opportunity to bid on the work orders that were presented to him.  (Dkts. 65 at 43:16–18; 71 ¶ 28.)  In 2017, Lamoureux emailed a client seeking a review of Medina's work and stating that a good review would factor into his monthly review and help him earn a small bonus.  (Dkts. 69-1 at 445; 71 ¶ 63.)

As far as tools, Medina owned all the basic tools, such as carpentry, plumbing, electrical, and roofing tools.  (Dkts. 63-5 ¶ 62; 70 ¶ 62; 65 at 40:23–41:5.)  Five Star told him that they were not going to provide any tools to him.  (Dkts. 63-5 ¶ 63; 70 ¶ 63; 65 at 41:16–17.)  Thus, if he did not have a specialized tool that he needed, he would buy it for himself.  (Dkts. 63-5 ¶ 62; 70 ¶ 62; 65 at 41:6–14.)  He used his own vehicle while affiliated with Five Star.  (Dkts. 63-5 ¶ 59; 70 ¶ 59.)  Neither Title One

nor Gilstrap ever provided him with any tools or a vehicle.  (Dkts. 63-5 ¶¶ 69–70; 70 ¶¶ 68–69.)  But Title One issued Medina a credit card to purchase materials.  (Dkts. 69-1 at 297–99; 71 ¶ 33.)

Medina testified that for every single week he worked for Five Star he worked more than 40 hours.  (Dkt. 65 at 52:5–11.)

## II.   Standard of Review

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (citing *Anderson*, 477 U.S. at 248).   A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 1361 (citing *Anderson*, 477 U.S. at 248).

The party moving for summary judgment bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986)).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

A district court must "resolve all reasonable doubts about the facts in favor of the non-movant[] and draw all justifiable inferences in his or her favor."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alteration adopted) (quoting *Four Parcels*, 941 F.2d at 1437).  "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."  *Mize*, 93 F.3d at 742.

## III.   Discussion

The complaint contains three counts: failure to pay overtime wages in violation of the FLSA, breach of contract, and intentional breach of contract.  (Dkt. 1 ¶¶ 130–45.)  Defendants move for summary judgment on all claims.  (Dkt. 63 at 1.)

### A.   Failure to Pay Overtime Wages

In Count I, Plaintiffs allege Defendants violated the FLSA by failing to compensate them for overtime work.  (Dkt. 1 ¶¶ 130–37.)  The FLSA requires employers to pay their employees at least one and a half times their regular wage for every hour worked in excess of forty per week. 29 U.S.C. § 207(a)(1).  If an employee has worked overtime without pay, he may bring a private FLSA action for damages.  *Id.* § 216(b).  "An unpaid-overtime claim has two elements: (1) an employee worked unpaid overtime, and (2) the employer knew or should have known of the overtime work."  *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) (citing *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314–15 (11th Cir. 2007)).

### 1.    Gilstrap

Gilstrap cannot be held individually liable for violating the overtime provision of the FLSA unless he is an "employer" under the Act. 29 U.S.C. § 207(a)(1); *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160 (11th Cir. 2008).  The FLSA broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  "Whether an individual falls within this definition does not depend on technical or isolated factors but rather on the circumstances of the whole activity." *Alvarez*, 515 F.3d at 1160 (internal quotation marks omitted) (quoting *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 237 (5th Cir. 1973)).

Defendants contend summary judgment is appropriate as to Gilstrap because he is not an employer as defined by the FLSA.  (Dkts. 63-1 at 6–8; 76 at 6–7.)  Defendants explained some of the relevant law and then set forth their "argument" which consists of conclusory statements:

> Under this framework, there is no genuine dispute that Mr. Gilstrap was not Plaintiff's [sic] "employer," because Mr. Gilstrap did not "act directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  The

24

> undisputed facts are that Mr. Gilstrap was neither involved in the day to day operations of Five Star's vendors, nor did he have any direct responsibility for the supervision of Plaintiffs.

(Dkt. 63-1 at 8.)   Defendants literally took the legal test for employer under the FLSA and repeated its exact terms as their argument.   A reader of this argument is no more informed about the alleged factual basis for why, according to Defendants, there is no genuine dispute of fact as to Gilstrap than a reader of the federal statute which contains the test. This is wholly insufficient to meet their burden.   Defendants, as the movants, have the initial burden of showing the Court, by reference to materials on the record, the basis for the motion.   *See Celotex*, 477 U.S. at 323 ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").   Defendants setting forth two conclusory statements, as opposed to factually supported arguments, to show there is an absence of a genuine dispute of material fact does not meet their burden.

Even if Defendants had met their burden, however, the Court thinks there is a genuine dispute as to whether Gilstrap is an employer. Gilstrap is the sole owner of both Title One and Five Star. (Dkts. 61 at 27:5–11; 62 at 9:12–22; 71 ¶ 3.) "To be personally liable, an officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986).[16] Gilstrap testified by declaration that he is not involved in the day-to-day management of Title One or Five Star and does not supervise workers. (Dkt. 63-3 ¶ 3.) He also stated he does not make hiring and firing decisions, decide how workers are paid, enforce pay policies, have the authority to manage workers' schedules, or

---

[16] *Compare Donovan v. Grim Hotel Co.*, 747 F.2d 966 (5th Cir. 1984) (concluding that the defendant was an employer where he began and controlled the hotel corporations, held their purse strings, guided their policies, could authorize compliance with the FLSA, solved major problems, and had "ultimate control over wages") *and Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th Cir. 1991) (affirming the district court's grant of summary judgment against the president and co-owner of a corporation on the FLSA employer issue because the president had a "significant ownership interest in the corporation" and exercised "control over significant aspects of the corporations day-to-day functions, including determining employee salaries"), *with Wirtz v. Pure Ice Co.*, 322 F.2d 259 (8th Cir. 1963) (finding that a majority stockholder who visited the company only two or three times a year and "had nothing to do with the hiring of the employees or fixing their wages or hours" was not an employer under the FLSA).

have any responsibility for preparing or keeping payroll records.[17]  (*Id.* ¶¶ 3–5.)

But there is evidence to the contrary.  In an email Gilstrap sent to Hill and Medina on September 24, 2017, for example, Gilstrap provided detailed instructions on how they should track their time and upload pictures.  (Dkt. 69-1 at 369–70, 429–30.)  From this email, a reasonable jury could infer Gilstrap was involved in setting policies applicable to Plaintiffs.  In an email Gilstrap sent to Hill on September 22, 2017, Gilstrap told him there is "a list of tools and personal stuff" that needs to be repaid and he has "no problem splitting [repayment] out over a few pay periods" as long as it "get[s] handled."  (*Id.* at 427.)  From this email, a reasonable jury could infer Gilstrap was involved in seeking repayment of various items from Plaintiffs.  Hill testified that Gilstrap was involved in the decision to hire him (Dkt. 66 at 31:9–32:8), and Medina testified that Gilstrap hired him (Dkt. 65 at 30:5–18).  From this testimony, a reasonable jury could infer Gilstrap made hiring decisions.  Kinslow testified that Gilstrap made the decision to have them work by the hour.

---

[17] To be sure, Gilstrap's statements are self-serving, but that alone does not permit the Court to disregard them at the summary judgment stage. *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018).

(Dkt. 64 at 113:13–16.)  From this testimony, a reasonable jury could infer Gilstrap decided how workers are paid.  Medina testified that he and Gilstrap agreed on his pay rate and one time he contacted Gilstrap when his compensation was wrong and Gilstrap fixed it.  (Dkt. 65 at 48:22–49:8.)  From this testimony, a reasonable jury could infer Gilstrap was involved in setting salaries and solving issues with Plaintiffs' compensation.  Kinslow testified that whenever he needed assistance with anything, he would contact Gilstrap and Gilstrap would walk him through the problem on the phone.  (Dkt. 64 at 88:3–17.)  From this testimony, a reasonable jury could infer Gilstrap assisted Plaintiffs with work orders and provided on-the-job training.  These examples show there is a genuine dispute of material fact as to whether Gilstrap's involvement was sufficient to make him an employer as defined by the FLSA.  The Court thus denies Defendants' motion for summary judgment as to Plaintiffs' FLSA claim against Gilstrap.

### 2.    Title One and Five Star

Defendants argue summary judgment is appropriate as to both Title One and Five Star because (1) the FLSA does not apply to them because they do not have two or more employees; (2) Plaintiffs failed to

allege any wage violations occurred; and (3) Plaintiffs are not employees. (Dkt. 63-1 at 11–22.)  They argue summary judgment is appropriate as to Title One because Five Star and Title One are not joint employers and Plaintiffs only relationship was with Five Star.  (*Id.* at 8–11.)

### a)    Number of Employees

Defendants contend it is "undisputed that Five Star has NO employees and Title One has only one employee." (*Id.* at 11.)  Given this, they argue:

> [U]ntil or unless Plaintiffs can prove that two of them are employees of Five Star, Five Star is not [a] covered enterprise[] under the FLSA, and their claims fail as a matter of law.  Similarly, until or unless Plaintiffs can prove that one of them was an employee of Title One, Title One is not a covered enterprise under the FLSA and their claims all fail as a matter of law.

(*Id.*)  That is not how summary judgment works.  As the movants, Defendants "bear[] the initial burden of demonstrating the absence of a genuine dispute of material fact."  *FindWhat Invs. Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 323).  "If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden."  *Ellison v. Hobbs*, 334 F. Supp. 3d 1328, 1338 (N.D. Ga. 2018) (citing *Four Parcels*,

941 F.2d at 1437–38).  "The first is to produce 'affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.'"  *Id.* (quoting *Four Parcels*, 941 F.2d at 1438).  "The second is to show that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Four Parcels*, 941 F.2d at 1438).  Defendants have done neither.  The Court thus rejects this argument.  *See Celotex*, 477 U.S. at 328 (White, J., concurring) ("[T]he movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.")

### b)   Wage Violations

Defendants argue the Court should "dismiss [Plaintiffs'] complaint" because "they have not alleged any facts demonstrating that Defendants violated any minimum wage or overtime laws. (Dkt. 63-1 at 12.)  This argument conflates the motion to dismiss standard with the summary judgment standard.  Notwithstanding, the Court does not think summary judgment is appropriate on this basis.  For an overtime claim brought under the FLSA, the employee bears the burden of proving he or she performed overtime work without appropriate compensation.

*Loiseau v. Thompson, O'Brien, Kemp & Nasuti, PC*, 499 F. Supp. 3d 1212, 1220 (N.D. Ga. 2020). The FLSA requires employers to keep records of their employees' wages, hours, and other conditions and practices of employment. 29 U.S.C. § 211(c). "In cases where the employer has kept proper and accurate records of its employees' hours, the plaintiff-employee may discharge his or her burden of proof simply by producing those records." *Stuart v. Resurgens Risk Mgmt., Inc.*, No. 1:11-CV-04251-RWS, 2013 WL 2903571, at *8 (N.D. Ga. June 12, 2013). When, however, an employer fails to keep records or the records are inaccurate or inadequate, the employee's burden of proof is "relaxed."[18] *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1315 (11th Cir. 2013).

---

[18] Courts have explained why a relaxed burden is necessary:

> [I]f an employer has failed to keep proper and accurate records and the employee cannot offer convincing substitutes, the solution is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the [FLSA].

*Allen*, 495 F.3d at 1315–16 (alterations adopted) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds*).

In this case, Defendants produced minimal or no time records for Plaintiffs. (Dkt. 71 ¶ 17.) Defendants' complete data production can be found in Plaintiff's Exhibit 11. (Dkt. 69-1 at 86–250.) Most of these documents are letters, Five Star's procedures for maintenance technicians, emails, vendor packets, W-9 documents, and Kinslow's criminal history. (*See id.*) Other than those, there are two timesheets for Hill and invoices from Ronald's Handyman Services to Five Star. (*Id.* at 93–96, 204, 206, 208, 210, 216, 228–30, 233–46, 248, 250.) The two timesheets for Hill are for the weeks of July 6–12, 2018 and July 20–27, 2018. (*Id.* at 93–96.) Considering Hill is seeking damages from May 2017 to August 6, 2018, two timesheets are wholly inadequate. And most of the invoices from Ronald's Handyman Services do not provide a record of the number of hours Kinslow worked.[19] (*Id.* at 204, 206, 208, 210, 216, 228–30, 233–46, 248, 250.) Additionally, Hill testified that Defendants

---

[19] What is more, most of the invoices are for work done outside the timeframe Kinslow is seeking damages. He admits that he was an independent contractor except for April 9, 2018 through January 2019. (Dkts. 63-5 ¶ 23; 70 ¶ 23.) Accordingly, this period is the only time frame for which he is claiming damages. (Dkts. 63-5 ¶ 23; 70 ¶ 23.) Many of the invoices have dates earlier than April 9, 2018. (*See* Dkt. 69-1 at 204 (dated 1/25/18), 206 (1/25/18), 208 (1/25/18), 210 (1/24/18), 234 (1/23/18), 235 (1/23/18), 236 (2/21/18), 237 (3/23/18), 238 (4/2/18), 239 (4/3/18), 240 (4/5/18), 241 (4/5/18), 244 (4/6/18).)

"fabricated" timesheets.  (Dkt. 66 at 118:11–119:8.)  This testimony calls into question Defendants' record.  *Allen*, 495 F.3d at 1316 ("Plaintiffs' deposition testimony calls into question the Board's records. . . . If true, these facts indicate that the Board's records cannot be trusted."). Because Defendants' records are inadequate and possibly inaccurate, Plaintiffs are entitled to the relaxed burden-shifting scheme.

Under such a scheme, the employee carries his burden by proving that he has in fact performed work for which he was improperly compensated and producing evidence that allows a just and reasonable inference of the amount and extent of that work.  *Loiseau*, 499 F. Supp. 3d at 1220 (citing *Estrada v. FTS USA, LLC*, No. 1:14-CV-23388-KMM, 2016 WL 6157989, at *3 (S.D. Fla. Oct. 24, 2016)).  "The burden then shifts to the employer, who must provide evidence that either (1) shows 'the precise amount of work the employee performed' or (2) 'negates the reasonableness of the inference to be drawn from the employee's evidence.'"  *Id.* (alteration adopted) (quoting *Allen*, 495 F.3d at 1316; *accord Brown v. Nexus Bus. Sols., LLC*, 488 F. Supp. 3d 1287 (N.D. Ga. 2020) ("If the employees meet their relaxed burden to prove the first element—that they worked unpaid overtime hours—the burden then

shifts to the employer 'to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference to be drawn from the employees' evidence." (alteration adopted) (citation omitted)).

As noted above, Defendants move for summary judgment on the basis that Plaintiffs fail to identify any evidence that they worked more than 40 hours per week such that they could potentially qualify for overtime pay under the FLSA. (Dkt. 63-1 at 11–13.)  Plaintiffs counter with evidence of their improperly compensated overtime work through timesheets and testimony.  They produced some timesheets showing they worked over 40 hours in certain workweeks.  (*See, e.g.*, Dkt. 64-1 at 141; 65-1 at 34; 69-1 at 421.)  Kinslow testified that there were "[s]everal weeks" when he worked overtime and did not get paid for that overtime work.  (Dkt. 64 at 91:8–15.)  He also stated that he worked an average of "60-plus hours a week" from April 2018 to January 2019.  (*Id.* at 94:2–9.) Hill testified that he "[a]bsolutely" turned in a payroll sheet that had more than 40 hours of work on it during the time he worked for Five Star. (Dkt. 66 at 67:9–12.)  He also testified that "almost every week was over 40" hours and 90% were over 50 hours per week.  (*Id.* at 99:19–24, 100:24–101:2.)  More broadly, he testified that "it was very rare" that

"any of the technicians worked a week and we only had under 40 hours."

(*Id.* at 101:4–6.)  Hill also testified that he submitted pay sheets that were

not paid (*id.* at 66:11–15), and he was "very open" about his money "being

withheld" because he "did honest work" and "wasn't paid" (*id.* at 119:5–

8).  Medina testified that for every single week he worked for Five Star

he worked more than 40 hours.  (Dkt. 65 at 52:5–11.)  He also testified by

declaration that he had "many issues" with Defendants' treatment of

him, including "issues with them [not] properly compensating [him] for

[his] work."  (Dkt. 69-4 ¶ 8.)  Drawing all reasonable inferences in favor

of Plaintiffs, the Court finds this is sufficient to avoid summary

judgment.  *See, e.g.*, *Torres v. Rock & River Food, Inc.*, 244 F. Supp. 3d

1320, 1333 (S.D. Fla. 2016) ("Although the Plaintiff could not answer

questions during his deposition about exact dates for which he was owed

overtime and what amount of money he would be willing to accept, this

is not fatal to his claim.  The Plaintiff contends that he worked

approximately sixty hours a week.  This estimation is not grossly

disproportionate to the times shown on the available time cards.

Moreover, whether sixty hours a week is a reasonable inference to draw

from the evidence is not a determination for the Court, rather it is the

duty of the trier of facts to draw whatever reasonable inferences can be drawn from the employees' evidence.  The determination of exactly how many hours Plaintiff was improperly compensated is therefore a question of fact appropriate for a jury." (internal quotation marks and citations omitted)); *Martinez-Pinillos v. Air Flow Filters, Inc.*, 738 F. Supp. 2d 1268, 1281 (S.D. Fla. 2010) (concluding there is a genuine issue of material fact as to whether the plaintiff worked overtime hours for which he was not compensated based on his testimony that (1) "his regular work schedule was 7:00 a.m. until 4:00 p.m. every week day with a 15 minute break for breakfast and a 30 minute break for lunch" and (2) he worked on the weekends two or three times a month).  There is a genuine dispute of material fact as to whether Plaintiffs worked overtime hours for which they were not compensated.

Two more points.  First, Defendants appear to add a "specificity" requirement to Plaintiffs' burden that does not exist.  *Solano v. A Navas Party Prod., Inc.*, 728 F. Supp. 2d 1334, 1344 (S.D. Fla. 2010) (explaining that the employee's burden in the relaxed burden-shifting scheme does not have a specificity requirement).  They emphasize that "Plaintiffs fail to allege or identif[y] a single specific workweek in which they . . . worked

more than 40 hours." (Dkt. 63-1 at 12–13.) But Plaintiffs' relaxed burden allows them to prove damages by way of estimate. It is Defendants' burden, on the other hand, to come forward with evidence of the *specific* amount of work the employee performed or with evidence negating the reasonableness of the inference drawn from the employee's evidence. *Lamonica*, 711 F.3d at 1315. Second, Defendants contend "Kinslow and Hill admit they did not work every week during the time frame they claim they were improperly compensated (i.e.[,] Hill was in prison)." (Dkt. 63-1 at 13.) According to Defendants, this "failure, in and of itself, is fatal to Plaintiffs' claims." (*Id.*) The Court disagrees. The FLSA contemplates overtime on a week-by-week basis, 29 U.S.C. § 207(a), meaning Plaintiffs do not have to prove overtime every week to bring a claim for FLSA violations. It would be illogical to say a plaintiff automatically could not recover for 50 weeks of unpaid overtime just because she took a one-week vacation, for example.

### c)     **Employee or Independent Contractor**

Defendants contend Plaintiffs are not employees. (Dkt. 63-1 at 13–22.) Whether a plaintiff is an "employee" under the FLSA is a question of law for the Court, with subsidiary findings being issues of fact. *Patel*,

803 F.2d at 634 n.1; *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996) ("A determination of employment status under the FLSA . . . is a question of law . . . ."). The FLSA protections extend only to "employees." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013). The FLSA defines "employee" broadly. *Id.* Independent contractors, however, do not fall within that definition. *Id.* To determine whether a party was an employee or an independent contractor, courts look to the "economic reality" of the relationship between the alleged employee and alleged employer. *Id.* Several factors guide this inquiry:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship;
>
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 1311–12. While these factors are helpful, this list is not exhaustive, no one factor is determinative, and the overarching focus of the inquiry

is economic dependence. *Id.* at 1312. "When a disposition in either direction can be justified, the Court must err in favor of a broader reading of 'employee.'" *Hanson v. Trop, Inc.*, 167 F. Supp. 3d 1324, 1328 (N.D. Ga. 2016).

### (1)   Degree of control

Defendants exercised significant control over Plaintiffs in the work setting. They expected Plaintiffs to work exclusively for them Monday through Friday, 8:00 a.m. to 6:00 p.m. (Dkts. 66 at 56:6–12, 101:11–13; 71 ¶ 14; 73 at 17:15–18:6, 19:1–11.) Medina testified that he and Hill were referred to as "in-house handymen," "Mark's technicians," or "Robert's technicians," the last of which is a reference to Robert Gilstrap. (Dkts. 65 at 58:25–59:14; 71 ¶ 25.) Plaintiffs were required to attend a weekly mandatory maintenance meeting. (Dkts. 64 at 91:18–23, 121:8–15; 66 at 57:14–17, 58:6–7; 69-1 at 418; 71 ¶ 26; 73 at 49:5–20.) Plaintiffs could not, and did not, hire any subcontractors to assist with work orders assigned by Defendants. (Dkts. 64 at 87:1–8; 65 at 50:9–11; 66 at 82:14–18; 71 ¶ 35.) Defendants tracked Plaintiffs using GPS location features in vehicles and apps. (Dkt. 66 at 77:13–18.) If Plaintiffs did not have their GPS location on, Defendants would not pay them. (*Id.* at 78:12–14.)

Defendants required Plaintiffs to take pictures of their work as part of fulfilling their job duties and to get paid.  (Dkts. 64 at 116:8–20; 65 at 65:16–66:4, 66:24–67:9; 66 at 58:15, 78:9–14; 71 ¶ 37.)   If a repair exceeded $200, Plaintiffs were required to get permission.  (Dkts. 61 at 131:6–132:13; 69-1 at 327, 329, 454, 456, 458; 71 ¶ 29.)  At some points, Kinslow and Hill used vehicles owned by Defendants for work.  (Dkts. 64 at 58:11–18, 73:14–17; 66 at 51:3–22, 90:9–14; 71 at 8 n.7.)  Five Star told Kinslow that it would make tenants feel more comfortable and it would be more professional if he (and others) wore Five Star shirts while completing work orders.  (Dkts. 63-5 ¶ 35; 70 ¶ 35; 64 at 101:18–103:1.) If Medina needed to be absent for some reason, he had to ask for permission otherwise it would result in termination.  (Dkts. 65 at 42:25–43:9; 71 ¶ 20.)  Five Star sometimes sent people, such as Sergio or Jason, to the jobsite to supervise Medina.  (Dkts. 63-5 ¶ 72; 70 ¶ 71; 65 at 50:12–21.)

All the above forms of control are relevant in the control analysis and weigh in favor of a finding that Plaintiffs were employees rather than independent contractors.  Other aspects of the employment relationship weigh against Defendants exerting control.   For example, Plaintiffs

owned basic tools and could ask for a work order to be reassigned. (Dkts. 63-5 ¶¶ 22, 25, 48, 62, 65; 70 ¶¶ 22, 25, 48, 62, 65; 64 at 36:15–37:2, 69:1–13; 65 at 40:23–41:5, 43:10–12.) But these are minor freedoms when considered in the broader picture of Defendants' overwhelming control. Assuming factual inferences in favor of Plaintiffs, this factor points strongly toward employee status.

### (2)   Opportunity for profit or loss

The second factor considers the alleged employee's opportunity for profit or loss depending upon his managerial skill. *Scantland*, 721 F.3d at 1316. Plaintiffs' opportunity for profit was largely limited to their ability to complete more jobs. *Id.* at 1316–17 ("Plaintiffs' opportunity for profit was largely limited to their ability to complete more jobs than assigned, which is analogous to an employee's ability to take on overtime work or an efficient piece-rate worker's ability to produce more pieces."). "An individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profits via his managerial skill, and it does not indicate that he operates his own business." *Id.* at 1317. A job whose profits are based on efficiency is "more like piecework than an enterprise that actually depend[s] for

success upon the initiative, judgment[,] or foresight of the typical independent contractor." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

Plaintiffs' ability to influence their profits and losses was also impacted by the extent to which Defendants could reduce Plaintiffs' pay. Although Plaintiffs negotiated their pay with Defendants (Dkts. 63-5 ¶¶ 34, 49; 70 ¶¶ 34, 49; 65 at 48:21–49:8), Defendants unilaterally reduced their pay at times.  For example, when a job took longer than Defendants deemed appropriate, they sometimes reduced their pay.[20] (*See, e.g.*, Dkts. 64 at 96:3–7; 73 at 37:5–10.)

Plaintiffs' ability to earn additional income through their own initiative was limited.  Plaintiffs were expected to work exclusively for Defendants Monday through Friday, 8:00 a.m. to 6:00 p.m.  (Dkts. 66 at 56:6–12, 101:11–13; 71 ¶ 14; 73 at 17:15–18:6, 19:1–11.)  Because of this, Plaintiffs could not work for other companies during the week.  *See*

---

[20] *See Lang v. DirecTV, Inc.*, 801 F. Supp. 2d 532, 539 (E.D. La. 2011) ("Plaintiffs' ability to influence their profits and losses is also impacted by the extent to which defendants could deduct fees from plaintiffs' pay. This is particularly true if the defendants deducted fees in excess of the value of the jobs performed, and plaintiffs had no means of recourse to dispute the deductions.").

*Scantland*, 721 F.3d at 1317 ("Plaintiffs could not . . . work for other companies because of either a flat prohibition or because the schedules demanded by Knight prevented them from pursuing other work."). Plaintiffs could not offer additional services to Defendants' customers without permission from Defendants. (Dkts. 65-1 at 7; 66-1 at 6; 71 ¶ 31.) And if a repair exceeded $200, Plaintiffs were required to get permission. (Dkts. 61 at 131:6–132:13; 69-1 at 327, 329, 454, 456, 458; 71 ¶ 29.) Lastly, Plaintiffs could not, and did not, hire any subcontractors to assist with work orders assigned by Defendants. (Dkts. 64 at 87:1–8; 65 at 50:9–11; 66 at 82:14–18; 71 ¶ 35.)

Defendants argue "[n]othing in the record supports that Plaintiffs' ability to make their own decisions regarding how to operate their businesses was impeded by Five Star" and "[e]ach was solely responsible for deciding how many assignments to accept, how to organize and . . . schedule their day." (Dkt. 63-1 at 20.) But there is evidence that contradicts that. Hill testified they were "not allowed to bid on the jobs, reject jobs, there was no free rein like it was at the other companies [he] worked for. It was, Hey, you have to be here. You have to do this Monday through Friday." (Dkt. 66 at 56:4–8.) Kinslow testified by declaration

43

that he "was not allowed to decline work orders that Defendants sent" him and Lamoureux told him that if he did not like the work that was assigned to him, then he could see himself out the door because his "job was to perform the work Defendants assigned." (Dkt. 69-3 ¶¶ 1–2.) He could, however, ask for a work order to be reassigned if it was a job he was not qualified to do, but he never exercised that option. (Dkts. 63-5 ¶ 25; 70 ¶ 25; 64 at 69:1–13.) Medina testified by declaration that he could have refused work assigned to him by Defendants but he feared repercussions because "Defendants told [him] that [his] job was to perform work orders as part of [his] set daily schedule." (Dkt. 69-4 ¶ 4.) Plaintiffs, moreover, testified that they complained to Defendants that they needed more hours of work per week. (Dkts. 63-5 ¶¶ 39, 67; 70 ¶¶ 39, 66; 64 at 111:13–112:1, 122:3–17.) From this testimony, one might infer that Plaintiffs were not "solely responsible" for organizing their schedules because it does not make sense for someone to complain about not getting enough hours if that person was in complete control of scheduling his or her own hours.

Assuming factual inferences in favor of Plaintiffs, and in the light of the minimal opportunity for profit, this factor suggests economic dependence and points toward employee status.

### (3)   Investment in equipment or additional personnel required

The third factor considers the alleged employee's investment in equipment or materials required for his task or his employment of workers. *Scantland*, 721 F.3d at 1317.   This factor favors employee status, although only weakly.   The investment in equipment inquiry is relevant because "workers are more likely to be economically dependent on the person who supplies the equipment." *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1181 (11th Cir. 2012).   Defendants argue Plaintiffs "wholly admit" that they owned the tools necessary for a handyman to complete his job."   (Dkt. 63-1 at 21.)   Indeed, Plaintiffs owned basic handyman tools.   (Dkts. 63-5 ¶¶ 22, 26, 48, 62; 70 ¶¶ 22, 26, 48, 62; 64 at 36:15–37:2, 71:23–72:6; 65 at 40:23–41:5.)   And that fact certainly weighs in favor of independent contractor status.   But there are also facts that point in the direction of employee.   Hill testified that if he did not have a tool that he needed for a job, Defendants instructed him to go to Home Depot and pick out the tool.   (Dkt. 66 at 80:8–15.)   If a tool

broke and needed to be replaced, Defendants offered to replace them. (Dkts. 64 at 107:6–8; 71 ¶ 34; 73 at 17:25–18:2.)  Both Kinslow and Hill used vehicles owned by Defendants for work.  (Dkts. 64 at 58:11–18, 73:14–17; 66 at 51:10–19, 90:9–14; 71 at 8 n.7.)  Title One even issued Medina a credit card to purchase materials.  (Dkts. 69-1 at 297–99; 71 ¶ 33.)  As far as employment of workers, Plaintiffs could not, and did not, hire any subcontractors to assist with work orders assigned by Defendants.  (Dkts. 64 at 87:1–8; 65 at 50:9–11; 66 at 82:14–18; 71 ¶ 35.) Assuming factual inferences in favor of Plaintiffs, this factor weighs in favor of employee status, albeit the weight in that direction is minimal.

### (4)   Skill required

The fourth factor considers whether the service rendered requires a special skill.  *Scantland*, 721 F.3d at 1318.  Defendants argument as to this factor consists of two sentences: "As in *Risinger Bros.*, the Plaintiffs here do not make any allegations as to this factor in their complaint. Accordingly, this prong fails as [a] matter of law as to Plaintiffs."  (Dkt. 63-1 at 21 (internal citation omitted).)  Again, Defendants conflate the motion to dismiss standard with the summary judgment standard. *Compare Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))), *with* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") *and* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). Their citation to *Derolf v. Risinger Bros. Transfer, Inc.*, 259 F. Supp. 3d 876 (C.D. Ill. 2017), is similarly misguided, as that case involved a motion to dismiss— not a motion for summary judgment—and is merely persuasive authority.

Notwithstanding, this factor weighs in favor of employee status. "[T]he fact that workers are skilled is not itself indicative of independent contractor status." *Mosley v. Pittman Consultants, Inc.*, No. 1:15-CV-4247-TWT, 2017 WL 445925, at *4 (N.D. Ga. Feb. 2, 2017) (quoting *Brock*

*v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988)). "What matters is whether the worker is exercising business skills or initiative in addition to his or her technical skills." *Id.* (quoting *Brock*, 840 F.2d at 1060). While handyman work requires some skill, Plaintiffs have no licenses or specialized training. (Dkts. 64 at 21:6–9, 23:11–15; 65 at 15:6–9, 23:2–7; 66 at 26:13–27:5; 71 ¶ 48.) Assuming factual inferences in favor of Plaintiffs, this factor weighs in favor of employee status.

### (5)   Duration/Lack of permanence

The fifth factor considers the degree of permanency and duration of the working relationship. *Scantland*, 721 F.3d at 1318. "Permanence or a longer duration suggest an employment relationship." *Hurst v. Youngelson*, 354 F. Supp. 3d 1362, 1376 (N.D. Ga. 2019). This factor is given "only modest weight in assessing employee status under the FLSA." *Kellogg v. Fannie's Inc.*, 467 F. Supp. 3d 1296, 1313 (N.D. Ga. 2020) (citation omitted).

Defendants argue that the fact Plaintiffs could terminate their relationship with Defendants at any time means they were independent contractors. (Dkt. 63-1 at 21–22.) As support, they rely on *Taylor v. BP Express, Inc.*, No. CV 407-182, 2008 WL 5046071, at *4 (S.D. Ga. Nov. 24,

2008), for the proposition that the ability to terminate the working relationship indicates that the plaintiff is an independent contractor. (*Id.* at 22.)[21]  Plaintiffs contend that, in Georgia, all employment is deemed to be at-will, so this "fact is, at best, neutral." (Dkt. 69 at 19.)  The Court agrees that, in the absence of an agreement, Georgia follows an at-will employment doctrine. *H&R Block E. Enters., Inc. v. Morris*, 606 F.3d 1285, 1294 (11th Cir. 2010).  The Court also agree this fact is neutral. *See, e.g.*, *Ingram v. Passmore*, 175 F. Supp. 3d 1328, 1337 (N.D. Ala. 2016) ("[B]ecause of the at-will nature of their employment, the court finds that the permanency and duration factor does not favor either party.").  The duration of Plaintiffs' employment, however, weighs in favor of independent contractor status.  Kinslow claims he worked as an employee of Defendants from April 9, 2018 to January 2019. (Dkts. 63-5 ¶ 23; 70 ¶ 23.)  That is nine months.  Hill claims he worked as an employee of Defendants from May 2017 to August 6, 2018. (Dkts. 63-5 ¶ 42; 70 ¶ 42.)  That is fifteen months.  And Medina claims he worked as

---

[21] The Court notes that *Taylor* did not involve an FLSA claim but rather a Title VII sex discrimination claim.  *Taylor*, 2008 WL 5046071, at *3. That court analyzed the common law principles that determine whether a person is an independent contractor or an employee.  *Id.*

an employee from January to October 2017. (Dkts. 63-5 ¶ 57; 70 ¶ 57; 65 at 26:9–18.) That is ten months. This factor, though given comparatively less weight, weighs in favor of independent contractor status.

### (6)   Integral part of the alleged employer's business

The sixth and final factor considers the extent to which the service rendered is an integral part of the alleged employer's business. *Scantland*, 721 F.3d at 1319. Title One is a residential property management company, and Five Star does maintenance and rehab of residential rental properties for Title One and other property management companies and individual landlords. (Dkts. 63-5 ¶¶ 1, 7, 11; 70 ¶¶ 1, 7, 11.) Handyman services are integral to managing, maintaining, and rehabbing residential properties. Defendants do not dispute that Plaintiffs' work was integral to their business. (Dkt. 63-1 at 22.) This factor weighs clearly and strongly toward employee status.

### (7)   Weighing the factors

When all the facts are viewed in the light most favorable to Plaintiffs and all reasonable inferences are drawn in their favor, five of the six factors weigh in favor of employee status. The one factor that does not—permanency and duration—is given "only modest weight" in

assessing employee status.  *Kellogg*, 467 F. Supp. 3d at 1313.  Thus, after careful consideration of all the factors, it is clear the record contains evidence to support a finding that Plaintiffs were employees under the FLSA.  As such, summary judgment in favor of Defendants must be denied.

### d)    Joint Employer

Defendants argue summary judgment is appropriate as to Title One because Five Star and Title One are not joint employers and Plaintiffs only relationship was with Five Star.  (Dkt. 63-1 at 8–11.)  In support, Defendants make three arguments: (1) Plaintiffs fail to allege any facts demonstrating that Title One is a joint employer with Five Star; (2) it is "undisputed" or "uncontroverted" that Five Star and Title One are separate legal entities; and (3) merely referring to two defendants interchangeably is not sufficient to allege a joint employment relationship.  (*Id.*)  Defendants' first argument is conclusory and again conflates the motion to dismiss standard with the summary judgment standard.

Defendants' second argument indicates a clear misunderstanding of the joint employer doctrine.  As Plaintiffs note, the joint employment

doctrine is only necessary in cases involving separate legal entities.  (Dkt. 69 at 21 n.20.)  A conclusion that employers are "joint" assumes that they are separate legal entities but that they have chosen to handle certain aspects of their employer-employee relationships jointly.  *See, e.g.*, *Oreilly v. Art of Freedom Inc.*, No. 17-21251-CIV-WILLIAMS, 2018 WL 3350317, at *4 (S.D. Fla. July 9, 2018) (explaining that under the FLSA a worker can be dependent on, and thus jointly employed by, two or more separate entities.").   Joint and several liability thus follows.   *See* 29 C.F.R. § 791.2(f) ("For each workweek that a person is a joint employer of an employee, that joint employer is jointly and severally liable with the employer and any other joint employers for compliance with all of the applicable provisions of the [FLSA], including the overtime provisions, for all of the hours worked by the employee in that workweek.").

For the third argument, Defendants cite *Gonzalez v. Old Lisbon Restaurant & Bar LLC*, 820 F. Supp. 2d 1365, 1368–69 (S.D. Fla. 2011), for the proposition that merely referring to two defendants interchangeably is not sufficient to allege a joint employment relationship.  (Dkt. 63-1 at 9–10.)  The Court does not see where *Gonzalez* makes that proposition.  But beyond that, Defendants reliance on this

case evidences a misunderstanding of FLSA law.  *Gonzalez* dealt with
FLSA's joint enterprise coverage, not the joint employment doctrine.
These are two distinct concepts with distinct tests.[22]  The enterprise
analysis is relevant only to the issue of coverage, whereas the joint
employment analysis is relevant to the issue of liability.  *See Patel*, 803
F.2d at 637 ("[W]e hold that the enterprise analysis is different than the
analysis of who is liable under the FLSA.  The finding of an enterprise is
relevant only to the issue of coverage.  Liability is based on the existence
of an employer-employee relationship."); *Chao v. A-One Med. Servs., Inc.*,
346 F.3d 908, 917 (9th Cir. 2003) ("Whether two companies constitute a

---

[22] To determine whether a joint enterprise exists, courts look to three
factors: the existence of three elements: (1) related activities; (2) unified
operation or common control; and (3) a common business purpose.
*Donovan v. Easton Land & Dev., Inc.*, 723 F.2d 1549, 1551 (11th Cir.
1984).  On the other hand, to determine whether a defendant is a joint
employer under the FLSA, courts look to eight factors: (1) the nature and
degree of control of the workers; (2) the degree of supervision, direct or
indirect, of the work; (3) the power to determine the pay rates or the
methods of payment of the workers; (4) the right, directly or indirectly,
to hire, fire, or modify the employment conditions of the workers; (5)
preparation of payroll and the payment of wages; (6) ownership of
facilities where work occurred; (7) performance of a specialty job integral
to the business; and (8) investment in equipment and facilities.  *Freeman
v. Key Largo Volunteer Fire & Rescue Dep't, Inc.*, 494 F. App'x 940, 943
(11th Cir. 2012) (per curiam) (citing *Layton*, 686 F.3d at 1178–81).  While
both parties cite this eight-factor test, neither uses it in their arguments.
(Dkts. 63-1 at 8–11; 69 at 20–22.)

single enterprise for FLSA coverage and whether they are liable as joint employers under § 207 are technically separate issues." (citing *Patel*, 803 F.2d at 637)).   The *Gonzalez* court even acknowledged this difference: "[T]he fact that the same managing member operated both companies only means that the individual defendant could be considered a joint *employer* with, and equally liable as, either corporate defendant.  It does not, however, establish that the two businesses themselves are joint enterprises."   820 F. Supp. 2d at 1369 (emphasis in original) (internal citation omitted).  The Court also finds *Gonzalez* to be unhelpful because it was at the motion to dismiss stage.  820 F. Supp. 2d at 1367.  The Court rejects all three of Defendants' arguments on this issue.

## B.   Breach of Contract

In Count II, Plaintiffs allege Defendants had a contractual obligation to pay them at a specified hourly rate for all hours worked and they failed to do so.  (Dkt. 1 ¶¶ 138–42.)  The elements of a breach of contract claim in Georgia are "(1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." *Brooks v. Branch Banking & Tr. Co.*, 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015) (citing *Kabir v. Statebridge Co.*, No. 1:11-cv-2747-WSD, 2011 WL 4500050, at *7 (N.D.

Ga. Sept. 27, 2011)).   Defendants argue summary judgment is appropriate because Plaintiffs are unable to (1) prove a breach or (2) support the element of damages.  (Dkt. 63-1 at 23.)

On breach, Defendants contend Plaintiffs cannot and have not produced evidence showing they were paid incorrectly.  (*Id.*)  Defendants failed to point to any evidence, or lack of evidence, in the record which supports this argument.[23]   A conclusory statement is insufficient for Defendants to meet their initial burden.  *See, e.g.*, *Ameris Bank v. SB Partners, LLC*, 157 F. Supp. 3d 1356, 1359 (S.D. Ga. 2016) ("A mere conclusory statement that the nonmovant cannot meet the burden at trial is insufficient." (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991))); *In re Giordano*, No. A01-83528-REB, 2008 WL

---

[23] As explained above, Defendants, as the moving parties, "bear[] the initial burden of demonstrating the absence of a genuine dispute of material fact." *FindWhat*, 658 F.3d at 1307 (citing *Celotex*, 477 U.S. at 323).  "If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden." *Ellison*, 334 F. Supp. 3d at 1338 (citing *Four Parcels*, 941 F.2d at 1437–38).  "The first is to produce 'affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.'"  *Id.* (quoting *Four Parcels*, 941 F.2d at 1438).  "The second is to show that 'there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Four Parcels*, 941 F.2d at 1438).  Defendants have done neither with this argument.

7874170, at *2 (Bankr. N.D. Ga. Sept. 17, 2008) ("It is insufficient . . . to obtain relief on a motion for summary judgment 'without supporting the motion in any way or with only a conclusory assertion that the plaintiff has no evidence to prove his case.'" (quoting *Celotex*, 477 U.S. at 328 (White, J., concurring))).  By merely stating that Plaintiffs have failed to produce any evidence showing they were paid incorrectly, Defendants are essentially asking the Court to scour the record and find evidence, or lack of evidence, that supports Defendants' argument.  This is inappropriate because it is not the Court's duty to locate evidence in the record that supports Defendants' motion.  The Court denies their motion as to this argument.[24]

---

[24] To be sure, Defendants' assertion is also not true.  Viewing the evidence in the light most favorable to Plaintiffs as the non-movants, there is evidence in the record from which a reasonable jury could conclude that Plaintiffs were paid incorrectly.  Here are some examples.  Kinslow testified that he worked overtime for several weeks and was not paid for it.  (Dkt. 64 at 91:8–15.)  Hill testified that he submitted pay sheets that were not paid.  (Dkt. 66 at 66:11–15.)  He also testified that Defendants "fabricated" timesheets.  (*Id.* at 118:11–119:8.)  And he was "very open" about his money "being withheld" because he "did honest work" and "wasn't paid."  (*Id.* at 119:5–8.)  Medina testified by declaration that he had "many issues" with Defendants' treatment of him, including "issues with them [not] properly compensating [him] for [his] work."  (Dkt. 69-4 ¶ 8.)

On damages, Defendants contend Plaintiffs "are unable to point to [a] specific dollar amount they [are] owed, cannot give specific amounts of time they feel [they] were undercompensated[,] and offered only speculative testimony at deposition." (Dkt. 63-1 at 23.) The Court disagrees. Plaintiffs must prove the amount of damages with reasonable certainty. Establishing reasonable certainty, however, only requires sufficient evidence for a jury to estimate the damages. *Paul Davis Sys. of Savannah, Inc. v. Peth*, 412 S.E.2d 279, 281 (Ga. Ct. App. 1991) ("As to damages, a jury must be able to calculate the amount of damages from the data furnished and it cannot be placed in a position where an allowance of loss is based on guesswork. A jury must be able to calculate loss with a reasonable certainty. The party claiming damages carries not only the burden of proving damages, but also furnishing the jury with sufficient data to estimate the damages with reasonable certainty. It is not necessary, however, that the party on whom the burden thus rests should submit exact figures." (alteration adopted) (internal quotation marks and citations omitted)). In other words, a plaintiff does not lose her right of action for damages because she cannot furnish exact figures. *Witty v. McNeal Agency, Inc.*, 521 S.E.2d 619, 628 (Ga. Ct. App. 1999)

("Where a party sues for specific damages, he has the burden of showing the amount of the loss, and of showing it in such a way that the jury may calculate the amount from the figures furnished, and will not be placed in the position where their allowance of any sum would be mere guesswork. However, the party does not lose his right of action for the damages because he can not furnish exact figures. The rule against the recovery of vague, speculative, or uncertain damages relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or extent of the damages." (internal quotation marks and citations omitted)).

For these reasons, the Court denies Defendants' motion for summary judgment on Count II.

## C.   Intentional Breach of Contract

In Count III, Plaintiffs allege Defendants intentionally breached their contract with Plaintiffs by refusing to compensate them for the agreed-upon hourly rate for all hours worked. (Dkt. 1 ¶ 143.) Plaintiffs seek to recover remote damages under O.C.G.A. § 51-12-10. (*Id.* ¶ 145.) Defendants argue summary judgment is appropriate as to this claim because there was no breach of contract and even if there was, it was not

intentional.  (Dkt. 63-1 at 24.)  Their first argument fails seeing as the Court denied Defendants' motion for summary judgment on the breach of contract claim.  As for the second argument, Georgia law provides: "When . . . a contract is broken . . . with knowledge and for the purpose of depriving the plaintiff of certain contemplated benefits, the remote damages occasioned thereby become a proper subject for the consideration of the jury."  O.C.G.A. § 51-12-10.  Defendants rely on *Maryland Casualty Insurance Co. v. Welchel*, 351 S.E.2d 645 (Ga. Ct. App. 1986), *aff'd in part, rev'd in part*, 356 S.E.2d 877 (Ga. 1987), for the proposition that "[o]nly where one acts knowingly for the purpose of bringing about injury, may there be a recovery of damages which would otherwise be remote."  *Id.* at 647 (citing O.C.G.A. § 51-12-10).  Defendants claim the "undisputed evidence" shows they acted in good faith and any breach of contract was a mistake and unintentional.  (Dkt. 63-1 at 24.) This is conclusory and wholly insufficient to meet their burden.  Again, Defendants, as the movants, have the initial burden of showing the Court, by reference to materials on the record, the basis for the motion. *See Celotex*, 477 U.S. at 323 ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").

Even if Defendants had met their burden, however, the Court thinks there is a genuine dispute of material fact as to whether the breach of contract—assuming one occurred—was "with knowledge and for the purpose of depriving the plaintiff of certain contemplated benefits." O.C.G.A. § 51-12-10. Indeed, Plaintiffs contend "the evidence shows Defendants intentionally removed time from Plaintiffs' pay, and such a willful act would permit a jury's finding of bad faith." (Dkt. 69 at 25.) And there is evidence to support this statement: Hill testified that Defendants "fabricated" timesheets. (Dkt. 66 at 118:11–119:8.)

For these reasons, the Court denies Defendants' motion for summary judgment on Count III.

## IV.   Conclusion

The Court **DENIES** Defendants' Motion for Summary Judgment (Dkt. 63).

The Court **ORDERS** this case to mediation.  The parties may retain the mediator to mediate this case.  The expense of a retained mediator must be paid by the parties.  The parties, alternately, may request that the Court appoint a magistrate judge to conduct the mediation.  The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court, on or before August 23, 2021, of their mediation preference.  If they elect to retain their own mediator, the parties shall identify the mediator on or before September 6, 2021.  The parties must have present at the mediation a person with authority to settle this litigation.

The parties shall, within five days after the mediation, notify the Court in writing whether mediation led to a settlement of this action.

The Court **STAYS** this case pending mediation.  The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of stay.

**SO ORDERED** this 9th day of August, 2021.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE